**Affirm and Opinion Filed August 19, 2022**



In The
# Court of Appeals
# Fifth District of Texas at Dallas

### No. 05-21-00556-CR

**ALEJANDRO AMOLES JR., Appellant**
**V.**
**THE STATE OF TEXAS, Appellee**

**On Appeal from the 416th Judicial District Court**
**Collin County, Texas**
**Trial Court Cause No. 416-84008-2020**

## MEMORANDUM OPINION

Before Justices Myers, Carlyle, and Goldstein
Opinion by Justice Myers

A jury convicted appellant Alejandro Amoles, Jr. of continuous sexual abuse

of a child and assessed punishment at fifty years in prison. Appellant raises four

issues, alleging a *Brady* violation, error in admitting a forensic examiner's outcry

testimony, error in refusing to admit an alleged prior consistent statement, and that

the evidence is insufficient to support the conviction. We affirm.

### BACKGROUND

**Mari Queller**

The first witness called by the State was Mari Ellen Queller, a financial

analyst. On Saturday, June 23, 2018, she drove from Austin to Allen to visit her

friend, the complainant's mother (mother). Mother lived in a house with appellant, her fiancé, and her then six-year-old daughter from a previous marriage, the complainant. The following morning, June 24, as Queller was packing up to leave, the complainant noticed her rolling up her pajamas. The complainant said they were pretty, and she asked Queller if she slept in them. Queller said yes and then asked if the complainant slept in pajamas. The complainant said she did, but then added that her mother and appellant did not "sleep in anything."

Queller testified that she did not think much of this at first because appellant and mother were engaged and living together. Later, however, the complainant told Queller something that caused her concern that sexual abuse was occurring. Queller told the complainant that she needed to tell someone about it, and the complainant indicated she had talked to two friends. The conversation ended when they heard mother and appellant getting up, which was around 9 a.m.

Queller drove back to Austin without telling mother what the complainant had said. On her way home, however, Queller realized the complainant was reaching out for help, and she called her sister to ask for advice. Queller then called mother and told her what the complainant had said, to which mother replied, "What an imagination." Queller called the Georgetown Police Department, and the Allen and Wylie Police Departments ultimately investigated.

Later that day, Queller received a call from mother. Mother put the call on speaker phone, and Queller could hear the complainant in the background "crying

hysterically." Queller asked the complainant what was wrong, and she said: "I lied. I lied, I'm sorry." Queller asked, "Am I on speaker?" When mother said yes, Queller replied, "Take me off speaker now," and the call ended abruptly. Queller testified that at that point it was clear to her mother did not believe the complainant. That evening, however, mother called Queller again and told her she had a conversation with the complainant and now believed the abuse had happened; that appellant had left; and the relationship was over. The call ended when mother received a call from the Allen Police Department. Queller testified that since that day, she has had no contact with mother or the complainant.

**The Forensic Interviewer**

The outcry witness, forensic interviewer Michelle Lanier, testified that she interviewed the complainant on June 24, 2018, at the Collin County Advocacy Center. Lanier testified that the complainant was able to say who abused her and that she described the abuse in a detailed, descriptive, and "[s]omewhat matter-of-fact way," but "[i]t did not appear that she understood that what had happened to her was not something that was supposed to happen." The forensic interviewer summarized the complainant's disclosures of abuse as follows:

> [The complainant] relayed to me that . . . she would snuggle with [appellant], and that he would snuggle up to her without any clothes on and that he would take her hand and place it on his private, and that then he would take his hand away and her—she would feel as her hand was stuck there, and that then she would wiggle it, her hand. And that when he would snuggle up to her, that he would wiggle his body back and forth, and she demonstrated that. She also demonstrated how her

–3–

hand would move when it was placed on his private, indicating back and forth.

Lanier further testified:

[The complainant] also stated that when [appellant] would be snuggled up to her body, they would be side by side and that sometimes her face would be facing him and sometimes her face would be facing away from him, and that would often require her to change hands for holding his private, and that she could feel his private on her private. And she pointed to her private, which she called a butt her front private [sic], and that she could feel it. She relayed that it felt weird and soft but also hard, and that it felt like there was a rectangle and then a hole at the end of it. And that when she touched that part it was soft but hard and tickle[d]. . . .

And that [appellant] would move—when I asked her what it felt like when she could feel his private on her private, she said, "I can just feel it moving all around."

The record also includes the following testimony:

Q. [STATE:] Did she also indicate that when his private was on her private it felt like it tickled?

A. Yes.

Q. And when she was talking about that rectangular part around the hole, did she say what happened when her hand got off that part?

A. She said it would slide down.

Q. Okay. And did she make a gesture at that point as well?

A. Yes.

Q. Did she indicate when during the day this would happen?

A. She stated it would happen in the morning before she would go to school, and that it would also occur when she got home from school.

The complainant said she had her clothes on when this happened. The

complainant told Lanier that appellant had her put her hand on his genitals when she

was five and six years old, telling Lanier: "It started when I'm five, and he had me touch him when I was five, and now I'm six, and still when I was six." The complainant also said appellant put his private part on her private part when she was five, stating: "The last time [it] happened when I was five, and that happened a few times, only a few times." The interview included a "touch inquiry" where they talked about different kinds of touches. Lanier testified in part:

Q. [STATE:] And when you started talking about private touches and explained to her what that was, what did she say when you said that?

A. She immediately said, "Oh, that's what [appellant] did," and moved into talking about what happened.

Q. Okay. And did she say, "This is what [appellant] does to me when I was five. The first time when I met him [was] when I was five; I was snuggling with him when I was five. We still do it when I'm six. I snuggle with him this way to his face. He grabs my hand and makes me touch his private spot. He makes me grab it"?

A. That's exactly what she said.

After the complainant's first forensic interview, the detective assigned to the case contacted Lanier and wanted clarification on the complainant's identification of certain body parts because she had used the word "butt" to refer to her front private part and appellant's front private part. Lanier interviewed the complainant a second time on June 26, 2018.

During the second interview, the complainant pointed to her front private part when referring to her "butt," and she correctly identified the front private parts on the male and female anatomical drawings. Lanier testified that the second interview

–5–

was consistent with the first, and at no point during either interview did the complainant say the abuse did not occur, or that she lied to get attention. Lanier, however, got the impression there was some influence at home that was putting pressure on the complainant. She told Lanier, "I told Mari [Queller,] and [appellant] and mommy thought it was a lie. It makes me feel sad because it wasn't." Lanier grew concerned the complainant might recant based on what she said during that second interview.

**Nurse Onyinanya**

Nurse Sandra Onyinanya performed a sexual assault exam on the complainant the day after her first forensic interview, June 25, 2018. Onyinanya testified that the complainant had a normal exam and showed no signs of any injuries or trauma. Nurse Onyinanya stated that this is very common and that 85 to 95 percent of all exams are normal. The complainant did not make any statements during the exam.

Before the exam, however, mother acknowledged to Onyinanya that the complainant had reported abuse to Mari Queller. As recalled by Onyinanya, mother reported that she had been told by "Mari" that the complainant had said to Mari that "mom's fiancé had made her touch his pee-pee." Mother also stated that she "felt like a horrible parent because she didn't believe her child." Nurse Onyinanya testified that she was worried the complainant would recant:

> I was worried a lot about recantation, [the complainant] taking her story back simply because multiple times mom told us that she didn't believe the child, that she was more worried about the fiancé than she was of

the child. Mom had made statements that possibly she knew this because she had walked in on them several times having sex, and that she's used to coming into their bed and things at night. So I was really afraid about recantation just because of the statements made by mom that she didn't believe her.

Onyinanya further testified that the complainant's description that it tickled when appellant wiggled his penis on her private spot was the type of sensory detail a child her age[1] should not know.

**Father**

The complainant's biological father (father) testified that the complainant is his child with mother. He and mother were married in 2008, separated in March 2015, and divorced in June 2016. According to father, appellant and mother were dating in 2017, when the complainant was five years old. He was living with them in 2018, when she would have been six. Father testified he only saw appellant and the complainant together on five occasions, but he never saw anything improper in the relationship between appellant and the complainant, and he noticed she had an obvious affection for appellant. When she stayed with father, the complainant never complained to him about appellant or said anything negative about him.

Father testified that, a week before trial, he came to the District Attorney's Office with the complainant and mother for a pre-trial meeting. While they sat in the waiting area, the complainant kept telling mother how scared she was, and that

---

[1] The complainant was born in February 2012, which would have made her six years old at the time of the sexual assault nurse exam.

she hoped "they" believed her. According to father, mother told the complainant "something to the effect of, 'Just remember to tell the truth, and the truth is that you lied to get attention.'" Although he could not be sure, this conversation led father believe mother could have been coaching the complainant to say the abuse did not happen.

**The Victim Advocate Coordinator**

Father's testimony that mother may have been coaching the complainant was supported by the testimony of Ruth Ruiz, the victim advocate coordinator for the Collin County District Attorney's Office. She testified that, the week before trial, the complainant and her parents came to the office for a pretrial meeting. Ruiz escorted them to a waiting area. While they were in the waiting room, Ruiz overheard mother talking to the complainant. Ruiz testified as follows:

> Q. [STATE:] [W]hat did you hear [mother] say?
>
> A. I heard [mother] telling [the complainant] to tell the truth. I heard her say, "You're not in trouble." I heard her say, "M[i]stakes happen." I also heard her say, "It was because you wanted to get attention, that I was getting engaged."
>
> Q. What did [the complainant] say after she said that?
>
> A. She asked what engaged meant.
>
> Q. So she asked, "What is engaged?"
>
> A. Yes. She said, "What is engaged?"
>
> Q. And did [mother] tell her what engaged means?
>
> A. She did.

Asked on cross-examination what mother was doing that Ruiz believed to be inappropriate, Ruiz answered, "I got the sense that she was coaching her daughter."

**The Complainant**

The complainant, nine years old at the time of trial, recanted during her testimony. After some introductory questions, the prosecutor asked her:

> Now, before we get started with anything else, I promised you that I would give you a chance to say what is really—what's really important for you to get out, and that you and your mom have talked about, and that you want to get out in front of this jury. Will you tell the jury what you need to say?

The complainant answered, "Well, I just really wanted attention, and this was kind of all just a lie." She added that she felt a little better after saying that.

She testified that appellant worked a lot, and she hardly ever saw him. The complainant testified that whenever she would climb into her mother's bed, appellant would be asleep, but he would wake up at some point when she was in bed with him. The complainant answered "no" when asked if appellant started putting her hand on his private spot when she was five years old. However, she remembered giving a forensic interview where she said appellant did that, and she had watched a video recording of the interview. The record then reads as follows:

> Q. [STATE:] Do you remember saying that, in your forensic interview, what it felt like—what his penis—I'm sorry, let me call it what you called it—what his private spot feels like or felt like in your hand?
>
> A. Yes.
>
> Q. Okay. Tell me what it felt like in your hand.

A. It was squishy, I guess.

Q. Okay.  And was it a little hard and a little soft?

A. It was just kind of soft.

The complainant later testified that "it" felt somewhere in between a hard table and squishy soft.

Asked by the prosecutor if appellant would "do anything with your hand on his body," the complainant replied "No."  But she testified that appellant would hug her tightly when they snuggled and that she could feel his body against hers, stating: "Well, I felt a lot of his body.  Like, I basically—like, I felt his arms, I felt his legs, I felt, like, his chest, a little bit of his head." She felt "[j]ust a little bit" of his bellybutton but did not feel his private spot.  When asked if she had heard herself on the video describing appellant's penis, the complainant stated:  "Like, I guess—well, I didn't see all of it.  I saw—I did see it in the drawing where she showed me, but, like, not all of it in real life."  The prosecutor asked if the complainant remembered laying on her side when this was happening and having to sometimes switch hands, and the complainant stated "Yes."  Asked why she would have to switch hands, the complainant testified that "it's kind of hard for me to make my hand—my arm go like this a lot."  The following then occurred:

Q. [STATE]: Okay. So if you were laying—did you sometimes lay on your side, or were you on your back, or were you on your stomach?

A. I was on my side.

Q. You were on your side?

A. (Nods head).

\* \* \* \*

Q. Okay. So you're on your side. . . . When you were on your side, did your arm—would it be able to move as much as the free arm that you weren't laying on?

A. No, it didn't move as much.

Q. It didn't move as much?  If you were on a different side, would you have to switch hands when that was all going on?

A. Yes.

Q. Could you use both hands at the same time?

A. No.

Q. Okay.  So if you were laying on your—this is my right.  If I—if you're laying on your right side, would you use your left hand?

A. Yes.

Q. Okay.  That was kind of hard to imagine, wasn't it?

A. Yes.

Q. If you were laying on your left side, would you use your right hand?

A. Yes.

Q. Okay.  Do you remember wiggling your hand sometimes?

A. Kind of.

\* \* \* \*

Q. Based on what you remember, not what you saw in the video, when you wiggled your hand, did something happen to his private spot?  Did it—and we talked about it a little bit, that it felt hard and it felt soft.

\* \* \* \*

A. It would just stay the same.

The complainant also testified that she had not seen appellant in over three years,

and that she "kind of missed him a lot."

The complainant testified on cross-examination that she lied about "[t]he private touch," that appellant never made her touch any part of his body, and that when she previously said she touched appellant and appellant touched her, she was talking about snuggling with him. The complainant said her mother talked to her about letting her know if anyone made her do something she should not be doing. The complainant said she was telling the truth now, but "wasn't really telling the truth in the past." The complainant testified that she just wanted some extra attention (e.g., wanted appellant "to hang out more with me"), and she wanted her mother and appellant to get married. Questioned about meeting the prosecutor the week before trial, the complainant testified as follows:

> Q. [DEFENSE COUNSEL:] When you would answer questions for her [the prosecutor], were you just answering some stuff because that's what she wanted you to do?"
>
> A. I knew that she wanted me to answer the questions, but I would just answer the questions for her.
>
> Q. Okay. Now, you told her last week that this never happened, right?
>
> A. Yes.
>
> Q. And then she wanted you to come back down here Friday?
>
> A. No.
>
> Q. What did you tell your mother?
>
> A. I told her—I told my mother that I didn't want to come back down here.
>
> Q. So your mom said, "We need to go back down to the DA's Office,"

and you said, "I don't want to go?"

A. Yes.

The complainant stated: "The truth is that he never did anything to me and I never did anything to him. I just wanted to—I made up the lie for attention."

On redirect, the complainant testified as follows:

Q. [STATE:] Okay. The other lawyer has asked a little bit about how you made this up to get attention. Okay? And you've just watched your forensic interviews, so my question is: How did you know to make up the details when you talked to the lady at the Children's Advocacy Center?

A. Well, I just described it in my own way.

Q. Okay, so you described it in your own way, and it was just from your imagination?

A. Yeah.

Q. [D]id you know that what you were saying happened should not have happened, or did you just think you were talking about something?

A. I just thought I was talking about something.

Q. You didn't really know that it was bad, or not the right thing, or anything like that?

A. I didn't know if it was bad or good. I didn't really know anything.

Asked if she was worried about what would happen to appellant if the jury thought something occurred, the complainant answered, "Yes." Asked if she was worried about him getting in trouble, she again answered, "Yes." On re-cross examination, however, the complainant repeated that nothing happened; that appellant never made her touch his private parts; he never touched her private parts; and appellant's private parts never touched anything between her legs.

–13–

**Appellant**

Appellant, forty years old on the day he testified, denied committing any abuse against the complainant. He told the jury that he met mother through work in 2014. At the time, mother and father were separated and going through a divorce, and appellant and mother began dating about six months after they first met. Appellant and mother were already dating when he met the complainant; appellant had known the complainant since she was three years old. Appellant and mother got engaged in November 2017.

Appellant first heard about the complainant's allegations in June 2018. He remembered that he was outside the house working on his Tahoe when mother and the complainant came outside and told him "what had been said." Appellant testified that the news "blew me away," and that "I lost my breath when that happened." Appellant recalled that he did not know "whether it was a joke or it was for real." Appellant recalled saying, "Are you freaking kidding me?" Appellant also recalled that the complainant "was crying hysterically," and that she hugged him and said: "Daddy, I'm so sorry. I didn't mean to say that." Mother "was distraught" and crying. When appellant later went inside the house, mother and the complainant apologized to him, but they did not talk further about the allegations. Appellant testified that complainant was never threatened, that he moved out of the house on June 23, 2018, and that he had had no contact with the complainant since that time. Appellant and mother dated for a short time afterwards before concluding it was

never going to work. Asked if he was still in love with mother, appellant responded: "Oh yeah."

On cross-examination, appellant testified that he was living with mother and the complainant when the complainant was five and when she was six years old. During that time, he would stay at the house once or twice a week, depending on his work schedule, and he sometimes stayed at home up to four days a week. Appellant acknowledged that, when he was home, mother got up earlier than he did, and the complainant would come into the bedroom wearing her pajamas and climb into bed with him. Appellant testified that he slept in the nude. He initially stated that when the complainant got into bed, he would tell mother to come and get the complainant, and he would run to the shower and get dressed. But appellant also testified that, when he was at home, the complainant would come to his room with her pajamas on and get into bed with him while he was nude.

**Mother**

Mother testified that she and father separated in 2015, and that she met appellant that same year. Her divorce was final in 2016. At some point, appellant moved into her house. Mother testified that appellant loved doing anything the complainant wanted to do, including playing games and watching movies. When her friend Mari Queller told her what the complainant had said in June 2018, mother was shocked because she, appellant, and the complainant "were always together as a family." Mother recalled telling Queller, "There's no possible way." Mother

testified that she first spoke to appellant about it and then they both talked to the complainant, at which point, according to mother, the complainant recanted. Mother then spoke to the complainant alone and recalled saying to her: "This is huge. How come you never told mommy? I mean, you never told your daddy? You never told anybody? And we talked about this every time, about inappropriate touches and things like that." As a result of her conversation alone with the complainant, mother "formed an opinion that [the complainant's allegation] was not truthful." Later that day, June 24, 2018, Detective Chad Hermes of the Allen Police Department contacted mother, and she brought the complainant to the Children's Advocacy Center. The complainant had not seen appellant since that day, but appellant and mother continued their relationship "for another year or so" before ending it.

Mother testified that the complainant recanted multiple times: to Mari Queller over the telephone; to mother alone; to mother when appellant was present; and to mother in the subsequent weeks and years. Asked if there had ever been an occasion after June 24, 2018, where the complainant indicated to her "in any way, shape, or form that her allegation was true," mother replied, "Nothing happened."

Mother also testified that she met with the lead prosecutor in the case in October 2020. Mother testified that she told the prosecutor that she did not believe the abuse occurred, and that the child had repeatedly recanted. Prior to this meeting, mother talked to the complainant and told her they were going to meet with the District Attorney's Office. Mother told the complainant she needed to know the

–16–

truth. According to mother, the child did not change her recantation in any way, and mother felt, over time, that people were not believing her regarding the child's recantation. Asked what she told the complainant regarding the need to tell the truth, mother replied, "I told her just to be truthful."

On cross-examination, mother testified that, when appellant lived with them, there were times when the complainant would crawl into bed with him while he was nude, and they snuggled together. This did not concern her. Mother testified that, from the time she first learned about the allegations, she did not believe the complainant had been sexually abused. She admitted knowing that the complainant had said to Queller that appellant "makes me touch his pee-pee." But she repeatedly acknowledged, when confronted with things the child said during her forensic interview, that she did not know the specific allegations the complainant made in the interview. Mother also acknowledged that the complainant (who was six years old during the forensic interview) should not know what a penis felt like in her hand. Mother insisted she still loved appellant.

The jury ultimately found appellant guilty of continuous sexual abuse of a child and assessed punishment at fifty years in prison.

### DISCUSSION

### 1. Brady; Article 39.14

In his first issue, appellant argues the trial court erred in overruling his motion to dismiss based on alleged violations of *Brady v. Maryland*, 373 U.S. 83 (1963) and

article 39.14 of the Texas Code of Criminal Procedure (the Michael Morton Act). The State responds that appellant failed to request a continuance and, thus, failed to preserve error; and that appellant cannot show he was harmed under the Michael Morton Act or prejudiced under *Brady*.

On Monday, May 10, 2021, the first day of trial testimony, defense counsel filed a motion to dismiss the indictment on due process grounds, alleging the State violated *Brady* and the Michael Morton Act. The motion alleged that the lead prosecutor met with the complainant and her parents the previous Monday, May 3, but the prosecutor did not provide defense counsel with her meeting notes until Thursday, May 6, one day after jury selection. The motion also alleged that the prosecutor waited until Friday, May 7, to tell defense counsel that a District Attorney's Office employee, Ruth Ruiz, provided a statement regarding a conversation she overheard between the complainant and mother on May 3.

In support of these allegations, counsel attached emails exchanged between defense counsel and the prosecutor. According to the emails, on Thursday, May 6, the prosecutor sent an email to defense counsel providing her notes from interviews with the complainant's father, mother, and the complainant. The prosecutor's notes contained information that the complainant described sexual abuse by appellant but also included information that the complainant had said: "The whole thing was kind of a lie. Wanted attention." In addition, the complainant allegedly said: "Didn't want attention. Didn't think it would go so bad. Wanted a little attention." The

–18–

prosecutor sent another email stating that these interviews had occurred on Monday, May 3, 2021, at 3:00 p.m.

On Friday, May 7, 2021, the prosecutor sent defense counsel an email stating that, on May 3, Ruth Ruiz overheard the complainant's mother telling her "to tell the truth, that mistakes happen, and that [she] wasn't in trouble." Ruiz also overheard mother saying to the complainant that "it was because you wanted attention that I was getting engaged." According to the notes, the child asked, "[W]hat is engaged?" Mother told Ruiz the complainant had recanted "and she didn't know why they were here."

The trial court held a hearing on the motion to dismiss on Monday, May 10, 2021, shortly before trial testimony began. The prosecutor testified, admitting the statements she obtained on May 3 needed to be provided to the defense. When defense counsel asked her why she had not provided them on May 3, the prosecutor answered:

> There was not a reason. I could have stayed and I could have turned those over to you on that day. The next day I was in meetings. The following day we picked the jury, and I turned them—the notes over to you on May 6th; however, I know that there was a concern of mine, not for turning over the Brady material, but for you knowing that [the complainant] had reaffirmed—that she had actually talked about the abuse, given your communications.

> So if I'm being honest with the Court, there may have been that in play in the back of my mind, about defense counsel and mom, in this case, learning about the child talking about the abuse since mom has primary custody of the child.

> But I did turn those notes over as soon as they—it was practicable for

me to do so.

The prosecutor explained that the complainant's recantation was not new material because the child had previously recanted, and defense counsel had remained in contact with mother: "I think there's a distinction to be made when defense counsel has already received the same information and is in contact with the party who is providing that information." Later in the hearing, defense counsel indicated that he had previously told the prosecutor that it was his understanding the complainant had recanted:

> Q. [DEFENSE COUNSEL:] [B]ack to our conversation in December of 2019 when I told you that it was my understanding the child had recanted, do you recall what your immediate response was?
>
> A. [PROSECUTOR:] No, but I saw it in your motion, and I disagree with your account of it.
>
> Q. In fact, you said, "No, that hasn't happened." And I asked you at that time if you had talked to the child—
>
> A. Uh-huh.
>
> Q. —and you said, "No."—
>
> Q. —is that correct?
>
> A. That sounds like something I might say.

Defense counsel called Ruiz to testify and questioned her about her interactions with mother and the complainant. Ruiz denied hearing the complainant say she had lied but testified that mother told her the complainant had recanted. Ruiz also overhead mother tell the complainant to tell the truth and that the truth was that the complainant made up the allegations to get attention. The State questioned Ruiz

–20–

as follows:

> Q. [STATE:] [J]ust to be clear, on May 3rd you heard [mother] come into your office and immediately start to tell [the complainant] to tell the truth, and that the truth is that she made it up to get attention; is that correct?
>
> A. That is correct, absolutely.

At the end of the hearing, defense counsel argued:

> [B]rady and Michael Morton are there for a reason, and it's a reason so that defendants have a right to have a fair trial and have sufficient notice of things before trials start, and trials start when juries are picked. And it's clearly evident from the evidence in this case that [the prosecutor] made a conscious decision to not provide the information that we were entitled to prior to jury selection.
>
> These are clear Brady and Michael Morton violations, and we believe this—that the State ought to have to follow the rules, and we request that the case—request the relief we sought in our motion.

Counsel asked the trial court to dismiss the indictment. The prosecutor replied:

> Judge, while I could have turned those notes over sooner, admittedly, it is certainly not a violation—a Brady violation that I did not. Defense counsel did have an opportunity and, in fact, did voir dire on recantation and that this child has been recanting for years. That was a part of his voir dire, and the reason he knew to do that was because he has been in communication with this mother from the start, but also, Judge because I had already turned over notes that indicated that there was something out there that said that the child had been—had recanted.
>
> Judge, at this point, he has had enough time to use the information that I've given him that he's had since Thursday, it is now Monday. I would feel differently, perhaps, if he hadn't had the opportunity to voir dire on it, but he did. And for that reason, Judge, I don't think that he has been prejudiced or his client has not been prejudiced in any way. It was not new information, and so we're going to ask that you deny his motion.

Defense counsel also argued that the timing of the State's disclosure was

"outrageous" and "ridiculous." Based on the testimony it heard and a review of the

–21–

motion, the trial court denied the motion to dismiss.

Although his brief does not fully distinguish between the two issues or their separate standards of review, appellant argues on appeal that the trial court's denial of his motion to dismiss violated *Brady* and article 39.14. *See* TEX. CODE CRIM. PROC. 39.14. To preserve each of these alleged errors, however, appellant was required to seek a continuance below, which he did not do. *See Rodriguez v. State*, 630 S.W.3d 522, 524–25 (Tex. App.—Waco 2021, no pet.) (defendant waived article 39.14(a) complaint by not requesting continuance when State disclosed document for first time on first day of trial); *Siebert v. State*, No. 05-18-01386-CR, 2020 WL 5542544, at *6 (Tex. App.—Dallas Sept. 16, 2020, pet. ref'd) (mem. op., not designated for publication) (no preservation of error under *Brady* and article 39.14 because of failure to request continuance after untimely disclosure); *Ray v. State*, No. 10-17-00394-CR, 2018 WL 4926215, at *6 (Tex. App.—Waco Oct. 10, 2018, pet. ref'd) (mem. op., not designated for publication) (just as a defendant's failure to request continuance waives any *Brady* violation, defendant's failure to request a continuance also waives any violation under article 39.14(h)); *see also Guerrero v. State*, No. 05-17-00238-CR, 2018 WL 6039647, at *1 (Tex. App.—Dallas Nov. 19, 2018, no pet.) (mem. op., not designated for publication) (where there has been delayed disclosure of *Brady* evidence, failure to request a continuance waives any *Brady* violation); *Barrientos v. State*, No. 05-14-00041-CR, 2015 WL 1089670, at *4 (Tex. App.—Dallas Mar. 10, 2015, no pet.) (mem. op., not designated for

publication) (to preserve error regarding State's willful withholding of evidence in violation of discovery order, defendant must request continuance of trial) (citing *Duff–Smith v. State*, 685 S.W.2d 26, 32 (Tex. Crim. App. 1985)).

Appellant argues he was prevented from moving for a continuance because the trial court had already sworn in the jury, but article 29.13 of the Code of Criminal Procedure provides that the court may grant a motion for a continuance after trial has begun when the court finds that "by some unexpected occurrence since trial began, which no reasonable diligence could have anticipated, the applicant is so taken by surprise that a fair trial cannot be had."  *See* TEX. CODE CRIM. PROC. 29.13; *see also Osborne v. State*, No. 04-17-00104-CR, 2018 WL 2121016, at *6 (Tex. App.—San Antonio May 9, 2018, pet. ref'd) (mem. op., not designated for publication) (disclosure of exculpatory evidence during trial affords accused the opportunity to request a continuance); *Rendon v. State*, No. 11-14-00080-CR, 2016 WL 787150, at *3 (Tex. App.—Eastland Feb. 25, 2016, pet. ref'd) (mem. op., not designated for publication) ("Appellant was obligated to request a postponement or seek a continuance to preserve his complaint of surprise for our review."). Accordingly, appellant did not preserve his complaint for appellate review.

Furthermore, were we to conclude appellant preserved his argument on appeal, he cannot show harm under article 39.14 or prejudice under *Brady*. Beginning with article 39.14, when the Texas Legislature passed the Michael Morton Act in 2013, it revised article 39.14 of the Code of Criminal Procedure to

–23–

expand the availability and scope of discovery that must be produced by the State. *Watkins v. State*, 619 S.W.3d 265, 277 (Tex. Crim. App. 2021); *Williamson v. State*, No. 04-20-00268-CR, 2021 WL 4976326, at *3 (Tex. App.—San Antonio Oct. 27, 2021, no pet.) (mem. op., not designated for publication). Article 39.14 now requires "as soon as practicable after receiving a timely request from the defendant," the State "shall produce" certain information, including "written or recorded statements of the defendant or a witness . . . that constitute or contain evidence material to any matter involved in the action and that are in the possession, custody, or control of the state or any person under contract with the state." *See* TEX. CODE CRIM. PROC. art. 39.14(a). Under this provision, disclosure must occur "as soon as practicable." *Watkins*, 619 S.W.3d at 278 (quoting article 39.14(a)). Article 39.14 also provides that "the state shall disclose to the defendant any exculpatory, impeachment, or mitigating document, item, or information in the possession, custody, or control of the state that tends to negate the guilt of the defendant or would tend to reduce the punishment for the offense charged." *See* TEX. CODE CRIM. PROC. art. 39.14(h); *Watkins*, 619 S.W.3d at 276–77. Under this provision, the disclosure "shall" occur "promptly." *See* TEX. CODE CRIM. PROC. art. 39.14(k). A trial court's ruling on pretrial discovery is reviewed for an abuse of discretion. *See Branum v. State*, 535 S.W.3d 217, 224 (Tex. App.—Fort Worth 2017, no pet.); *see also Sopko v. State*, 637 S.W.3d 252, 256 (Tex. App.—Fort Worth 2016, no pet.). Violations of article 39.14 are reviewed for non-constitutional error under rule 44.2(b). *E.g.*, *Sopko*, 637

–24–

S.W.3d at 256; *Williamson*, 2021 WL 4976326, at *3; *Ziegler v. State*, No. 04-15-00559-CR, 2016 WL 5795208, at *2 (Tex. App.—San Antonio Oct. 5, 2016, no pet.) (mem. op., not designated for publication).

Assuming without deciding that the State violated article 39.14 by not disclosing the interview notes and witness statements to the defense on May 3, 2021, prior to the start of jury selection on May 5, the record does not demonstrate the requisite harm. *See* TEX. R. APP. P. 44.2(b). The record shows the defense was aware before the filing of the motion to dismiss the indictment that the complainant had recanted. The motion to dismiss, for example, refers to a continuance motion filed by the defense on December 5, 2019. In that motion, counsel stated that he believed "the complaining witness in this case has recently recanted her allegations against the defendant and that in the interest of justice that recantation should be fully investigated." The motion to dismiss also discussed a conversation counsel had with the prosecutor on December 5, 2019, when he told her that he understood the victim had recanted her allegation. During voir dire, counsel questioned the veniremembers about the subject of recantation, even though he did not yet have the State's disclosure. Appellant also fails to specify how he was harmed by the timing of the State's disclosure. Indeed, the videotaped statement by the complainant that the defense tried to introduce at trial (the basis for appellant's third issue), which shows the complainant stating that appellant did not sexually abuse her, was made before the October 2020 meeting with the District Attorney's Office, approximately

–25–

seven months before the start of trial. Additionally, the jury was well aware the complainant had recanted. As for the disclosures involving Ruth Ruiz, the defense had the opportunity at the hearing to question her about her background and her statements before she testified in front of the jury. Also, father testified at trial to overhearing a similar conversation to the one discussed in Ruiz's testimony, so Ruiz's testimony was cumulative of other unobjected-to evidence.

Turning to *Brady*, under *Brady* the State has a constitutional duty to disclose material, exculpatory evidence to a defendant. *Brady*, 373 U.S. at 87; *Pena v. State*, 353 S.W.3d 797, 810 (Tex. Crim. App. 2011). A *Brady* violation occurs when the State suppresses, willfully or inadvertently, material evidence favorable to the defendant. *Harm v. State*, 183 S.W.3d 403, 406 (Tex. Crim. App. 2006); *Kulow v. State*, 524 S.W.3d 383, 388 (Tex. App.—Houston [14th Dist.] 2017, pet. ref'd). Favorable evidence includes impeachment as well as exculpatory evidence. *Harm*, 183 S.W.3d at 406; *Kulow*, 524 S.W.3d at 388. The State does not have a constitutional duty to disclose evidence "if the defendant was actually aware of the exculpatory evidence or could have accessed it from other sources." *Pena*, 353 S.W.3d at 810; *Zeigler*, 2016 WL 5795208, at *2. Also, when favorable evidence is not concealed but disclosed untimely, the defendant bears the burden to show the delay resulted in prejudice. *Kulow*, 524 S.W.3d at 388 (citing *Little v. State*, 991 S.W.2d 864, 866 (Tex. Crim. App. 1999)). A defendant is prejudiced if the result of the proceeding would have been different had the evidence been disclosed earlier.

*Kulow*, 524 S.W.3d at 388. Prejudice is not shown where the information is disclosed in time for the defendant to make effective use of it at trial. *Id.*

Appellant argues he was prejudiced by the late disclosure regarding the complainant because she "recanted again to the ADA in the case, and that is a material, exculpatory fact that would have potentially changed the outcome of the trial." He fails, however, to specify how having this information sooner would have changed the outcome of the trial. As we discussed previously, appellant was aware the complainant had recanted prior to the filing of his motion to dismiss. In addition, the jury was aware the complainant had recanted.[2] Regarding the late disclosures involving Ruiz, appellant fails to offer any specific argument as to how her statement constituted *Brady* material. But even if we assume it constituted *Brady* material, the record does not show appellant was prejudiced by the timing of the State's disclosure. The defense cross-examined Ruiz both at the hearing and at trial, and appellant's failure to request a continuance when this evidence was disclosed is further indication the belated disclosure did not prejudice him. Furthermore, Ruiz's disclosure was cumulative of other evidence—i.e., father's testimony regarding a similar conversation to the one Ruiz overheard, and the testimony of the sexual

---

[2] The fact that appellant had the challenged information before testimony began, and that he was able to use it throughout trial, also distinguishes this case from *Pena*, 353 S.W.3d at 797, on which appellant partially relies. The challenged *Brady* evidence in *Pena* was not disclosed until *after* the jury had begun deliberating, and Pena did not have an opportunity to present it to the jury. *Id.* at 801–05. Moreover, it was the only evidence that substantiated Pena's defense. *Id.* at 811. The situation here is quite different. Thus, *Pena* does not support appellant's argument.

assault nurse examiner and the forensic interviewer that they were concerned the complainant might recant.

We conclude, therefore, that appellant failed to preserve error regarding his article 39.14 and *Brady* claims because he did not request a continuance, and, assuming error was preserved, that he cannot show he was harmed under the Michael Morton Act or prejudiced under *Brady*. We overrule appellant's first issue.

### 2. The Outcry Witness

In his second issue, appellant argues the trial court erred in allowing the forensic examiner to testify as an outcry witness. Appellant contends that admitting the testimony of Lanier, the forensic examiner, was "clearly error," and that Mari Queller was the first person the complainant approached and provided with discernable facts regarding an alleged offense and the perpetrator of that alleged offense. The State maintains, however, that the court acted within its discretion in designating the forensic interviewer as the proper outcry witness, and we agree.

We review the trial court's outcry witness determination for an abuse of discretion. *See Rodgers v. State*, 442 S.W.3d 547, 552 (Tex. App.—Dallas 2014, pet. ref'd); *Wright v. State*, Nos. 05-20-00417-CR & 05-20-00418-CR, 2021 WL 2948553, at *4 (Tex. App.—Dallas June 28, 2021, no pet.) (mem. op., not designated for publication); *Le v. State*, No. 05-16-01324-CR, 2018 WL 2001609, at *4 (Tex. App.—Dallas Apr. 30, 2018, no pet.) (mem. op., not designated for publication). An outcry witness is the first person over the age of eighteen, other than the defendant,

to whom the child made a statement about the offense or extraneous crime, wrong, or act. *See* TEX. CODE CRIM. PROC. art. 38.072, § 2(a); *Mejia v. State*, Nos. 05-19-01491-CR & 05-19-01494-CR, 2021 WL 1136762, at *4 (Tex. App.—Dallas March 25, 2021, no pet.) (mem. op., not designated for publication). "The statement must be 'more than words which give a general allusion that something in the area of child abuse is going on'; it must be made in some discernable manner and is event-specific rather than person-specific." *Lopez v. State*, 343 S.W.3d 137, 140 (Tex. Crim. App. 2011) (quoting *Garcia v. State*, 792 S.W.2d 88, 91 (Tex. Crim. App. 1990)).

The burden of proof is on the State, as the proponent of the evidence, to establish the elements of article 38.072 for the testimony to be admissible. *Rosales v. State*, 548 S.W.3d 796, 806 (Tex. App.—Houston [14th Dist.] 2018, pet. ref'd); *Montoya-Rodriguez v. State*, Nos. 05-13-01735-CR to 05-13-01737-CR, 2015 WL 636614, at *2 (Tex. App.—Dallas Feb. 13, 2015, no pet.) (mem. op., not designated for publication) (citing *Long v. State*, 800 S.W.2d 545, 547 (Tex. Crim. App. 1990)). If the State presents evidence that a person is a proper outcry witness, the burden to rebut this evidence then shifts to the defendant. *See Garcia*, 792 S.W.2d at 91–92; *Eldred v. State*, 431 S.W.3d 177, 184 (Tex. App.—Texarkana 2014, pet. ref'd); *Le*, 2018 WL 2001609, at *4.

The trial court in this case held a pretrial hearing regarding the State's 38.072 designation that it intended to offer hearsay statements of the complainant through witnesses Mari Queller and Lanier. Lanier testified that when she interviewed the

complainant, she provided details of sexual abuse. The complainant told Lanier she had first spoken about it to mother's friend "Mari," but she did not any provide details of their conversation. The complainant also said she talked to mother and appellant about it. To Lanier's knowledge, she was the first adult over the age of eighteen to whom the complainant provided details regarding the abuse. Queller testified that the complainant told her that she would climb into bed with mother and appellant, both of whom were naked; that mother would get up and get dressed; and that appellant would make her touch his "pee-pee," which Queller inferred to mean penis. The complainant, however, did not provide any other details. Defense counsel did not call any witnesses, arguing there was no evidence Lanier was the first person who was an adult that the complainant talked to. The State responded that Queller was the first adult to whom to the complainant made an allusion of child abuse, but she definitively described an offense to Lanier. The trial court designated Lanier as the outcry witness.

We find no abuse of discretion in the trial court's outcry witness designation. Appellant was charged with continuous sexual abuse of a child and two other counts involving aggravated sexual assault and indecency with a child, which were later abandoned. Regarding Queller, the complainant told her appellant slept in the nude and he had her touch his "pee-pee," but she did not describe how or with what she touched appellant's "pee-pee," nor what "pee-pee" meant. It was not until the complainant spoke with Lanier that she made detailed allegations of sexual abuse

–30–

that involved multiple incidents over a period of thirty days or more. The trial court could have reasonably concluded the complainant's statements to Queller were a general allusion that sexual abuse was occurring but not a clear description of the offense charged, as required by article 38.072. *E.g.*, *Garcia*, 792 S.W.2d at 91; *Wright*, 2021 WL 2948553, at \*2–4; *Mejia*, 2021 WL 1136762, at \*4.

Appellant relies primarily on a case from the Houston Fourteenth Court of Appeals, *Nino v. State*, 223 S.W.3d 749, 753 (Tex. App.—Houston [14th Dist.] 2007, no pet.), where the court concluded that the mother, not the forensic interviewer, was proper outcry witness because the victim told the mother first that the defendant had made him suck the defendant's penis. Appellant quotes the following statement from the opinion:

> Though the child's statements were not lengthy or detailed, they contained sufficient information about the nature of the act and the perpetrator to fall under article 38.072 of the Texas Code of Criminal Procedure. Therefore, the trial court abused its discretion in designating [the forensic interviewer], rather than [mother], as the outcry witness under section 38.072 of the Texas Code of Criminal Procedure.

*Id*. But appellant's reliance on this decision is misplaced. The defendant in *Nino* was charged with aggravated sexual assault of a child, and, as the court concluded, the evidence before the trial court was sufficient to show the victim described the offense in a discernable manner to his mother before he talked to the forensic interviewer. *See id*. In this case, on the other hand, the complainant alluded to Queller that "something in the area of child abuse was going on at home." *Garcia*, 792 S.W.2d at 91. Yet it was Lanier to whom the complainant described, in a

–31–

discernable manner, the charged offense of continuous sexual abuse of a child. Therefore, the trial court did not abuse its discretion in designating Lanier as the proper outcry witness. We overrule appellant's second issue.

### 3. Prior Consistent Statement

In his third issue, appellant contends the trial court erred in refusing to admit a video-recorded statement from the complainant offered by appellant as a prior consistent statement. The State responds that appellant forfeited any error regarding admissibility because he provided no argument at trial or on appeal regarding admissibility; that he failed to establish admissibility under the prior-recorded-statement hearsay exception; and that, alternatively, appellant was not harmed by the exclusion of the statement.

Mother testified in appellant's defense that, prior to her October 2020 meeting with District Attorney's Office, she spoke with the complainant and told her she needed to know the truth about the allegations. Mother then videotaped her conversation with the complainant, during which the complainant continued to recant. During mother's testimony, defense counsel offered into evidence a flash drive containing a recorded conversation mother had with the complainant prior to that October 2020 meeting. The State lodged a hearsay objection. The trial court held an off-the-record bench conference, and the parties did not address the issue further in the jury's presence.

The trial court held a hearing outside the jury's presence after mother testified.

–32–

The prosecutor argued that "to qualify for admission as a prior consistent statement, the witness must have made the statement before her motive to fabricate or other improper motive arose." Defense counsel then argued the video was admissible as a prior inconsistent statement. When the State asked him to clarify if he was offering the video as a prior inconsistent or a prior consistent statement, defense counsel replied: "Well, it's both. I mean, it's—who knows what this kid said." The trial court observed that "the testimony at trial from the child is that nothing happened; that she was not touched, that she was not—that nothing happened." As a result, the court noted, the video statement had to be a prior consistent statement. The trial court ultimately concluded, based on its review of the case law:

> [T]he prior consistent statement, if it were admissible, would only be admissible if it were made prior to the reason for the child changing, recanting arising, or the influence being placed upon the child.

> The testimony before us is that the child was influenced from the get-go; as soon as she told this story that that [sic]—the defendant and her mother, that she, being the sensitive child she is, has changed her story to accommodate their feelings, and therefore, this was made some two years later, two to three years later, and not—would not be admissible under the rulings of the Court that we have before us.

> So it's my feeling that case law does not allow that to be admissible.

The trial court ultimately ruled that the video was inadmissible under rule of evidence 801.[3]

The video recording, one minute and twenty-one seconds long, begins with

---

[3] The video was admitted for record purposes.

mother asking the complainant her name, and the complainant identifying herself. Mother then states: "[Complainant], today I'm going to talk to the D.A. this afternoon, and I'm going to tell them what is—what the truth is between you and [appellant], so mommy needs to know what is the truth between you and [appellant]." The complainant responded: "He never did anything to me. He didn't make me do anything; and I never touched him, and he never—he never made me touch him." The complainant looked down and off camera twice as she said this. Mother asked, "Nothing like that?" The complainant stated, "Nothing like that." Mother then said, "Because you know, you can always tell mommy and daddy anything, right?" The complainant said, "Yeah." Mother added that the complainant "can always come to mommy and daddy when something bad happens," and the complainant nodded her head in response. Mother then said, "Because you know it's not right to touch somebody else," to which the complainant again nodded her head in response. Mother added that "you know that it's not right for someone to touch you, too, inappropriately, right?" The complainant said, "Yeah." After that, mother stated, "Okay, so you understand that?" The complainant answered, "Yes." Mother then asked, "So you will let me know if anything like that ever happens, right?" The complainant nodded her head and said, "Yes." Mother ultimately asked: "But, you're telling me that nothing happened between you and [appellant]?" The complainant said in response: "Nothing, nothing happened."

Assuming without deciding that appellant preserved error, we conclude he has

shown no abuse of discretion. Rule 613(c) of the Texas Rules of Evidence provides that "[u]nless Rule 801(e)(1)(B) provides otherwise, a witness's prior consistent statement is not admissible if offered solely to enhance the witness's credibility." TEX. R. EVID. 613(c). Under rule 801(e)(1)(B), a statement is not hearsay if the declarant testifies at trial and is subject to cross-examination, and the statement is "consistent with the declarant's testimony and is offered to rebut an express or implied charge against the declarant of recent fabrication or improper influence or motive." *Id*. at 801(e)(1)(B). Reviewing courts employ a four-part test to determine whether a prior consistent statement is admissible under rule 801(e)(1)(B): (1) the declarant must testify at trial and be subject to cross-examination; (2) there must be an express or implied charge of recent fabrication or improper influence or motive of the declarant's testimony by the opponent; (3) the proponent must offer a prior statement that is consistent with the declarant's challenged in-court testimony; and, (4) the prior consistent statement must be made prior to the time the alleged motive to falsify arose. *Hammons v. State*, 239 S.W.3d 798, 804 (Tex. Crim. App. 2007); *Hayes v. State*, No. 05-16-00740-CR, 2017 WL 5663612, at \*7 (Tex. App.—Dallas Nov. 27, 2017, pet. ref'd) (mem. op., not designated for publication). The Court of Criminal Appeals has determined that, though rule 801(e)(1)(B) allows for the admission of prior consistent statements to rebut allegations of improper influence or motive, a "statement made after the alleged motive to fabricate arose does not rebut the allegation." *Haughton v. State*, 805 S.W.2d 405, 408 (Tex. Crim. App.

–35–

1990). We review the trial court's determination whether a prior consistent statement is admissible for abuse of discretion. *Hammons*, 239 S.W.3d at 806.

The trial court in this case did not abuse its discretion in excluding the statement because the court could have concluded it did not satisfy the requirements of rule 801(e)(1)(B). More precisely, the statement did not satisfy the fourth factor under *Hammons* because it was not made prior to the time the alleged motive to falsify arose. The complainant's motive to falsely recant—based on pressure from her mother and the complainant's desire to please her mother—began in June 2018, when the complainant described some of appellant's behavior to Queller. The complainant then quickly withdrew the allegations. She subsequently provided a detailed description of the sexual abuse to the forensic interviewer but continued recanting. The complainant's videotaped statement was recorded approximately two years after the complainant's disclosure to Queller. Although the State impeached the complainant's recantations at trial, "[a] witness so impeached cannot be supported or sustained by statements similar to those to which he or she testified [at] trial where the statements were made after the motive arose that would likely prompt the witness to testify falsely." *See* 25 TEXAS JURISPRUDENCE CRIMINAL PROCEDURE: *Trial* § 1126 ("Effect of time of making prior consistent statement") (3d ed. 2021); *see also Dowthitt v. State*, 931 S.W.2d 244, 263–64 (Tex. Crim. App. 1996); *Haughton*, 805 S.W.2d at 408.

Additionally, appellant was not harmed by the exclusion of the videotaped

statement. *See* TEX. R. APP. P. 44.2(b). The substance of the statement was cumulative because it was presented to the jury through other evidence—i.e., mother's testimony; the complainant's testimony that she told her mother nothing had happened; the complainant expressly recanting in front of the jury. Because the substance of the videotaped statement was cumulative, its exclusion was also harmless. *See id.* We overrule appellant's third issue.

### 4. Sufficiency of the Evidence

In his fourth issue, appellant argues the evidence is insufficient to support a finding of guilt for the offense of continuous sexual abuse of a child.

When determining whether the evidence is sufficient to support a conviction, we consider all the evidence in the light most favorable to the verdict and determine whether, based on that evidence and reasonable inferences therefrom, a factfinder could have found the essential elements of the charged offense were proven beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *Gear v. State*, 340 S.W.3d 743, 746 (Tex. Crim. App. 2011). The factfinder must resolve conflicts in the testimony, weigh the evidence, and draw reasonable inferences from basic facts. *Murray v. State*, 457 S.W.3d 446, 448 (Tex. Crim. App. 2015) (citing *Jackson*, 443 U.S. at 319). We presume the factfinder resolved any conflicting inferences in favor of the verdict, and we defer to that resolution. *See Jackson*, 443 U.S. at 326; *Clayton v. State*, 235 S.W.3d 772, 778 (Tex. Crim. App. 2007). We also defer to the factfinder's evaluation of the credibility and weight of the evidence. *Williams v.*

*State*, 235 S.W.3d 742, 750 (Tex. Crim. App. 2007).  This standard is the same for both direct and circumstantial evidence.  *Wise v. State*, 364 S.W.3d 900, 903 (Tex. Crim. App. 2012).

The indictment alleged that on or about February 9, 2012 through June 15, 2018, during a period of thirty or more days in duration, appellant committed two or more acts of sexual abuse, including:  (1) aggravated sexual assault of a child by intentionally and knowingly causing the female sexual organ of the complainant, a child then younger than fourteen, to contact appellant's male sexual organ; (2) indecency with a child by contact by intentionally and knowingly, with the intent to arouse or gratify the sexual desire of any person, engaging in sexual contact by causing the hand of the complainant, a child then younger than seventeen, to touch part of appellant's genitals.  The indictment also alleged that appellant was seventeen years of age or older at the time of the commission of each of these acts of sexual abuse, and the complainant was a child younger than fourteen.

A person commits the offense of continuous sexual abuse of a child if, during a period that is thirty or more days in duration, he commits two or more acts of sexual abuse and, at the time of the commission of each act, he is seventeen years of age or older and the victim is a child younger than fourteen years of age.  TEX. PENAL CODE § 21.02(b).  Although the exact dates of the abuse need not be proven, the offense requires proof that two or more acts of sexual abuse occurred during a period of thirty days or more.  *Garner v. State*, 523 S.W.3d 266, 271 (Tex. App.—Dallas 2017,

–38–

no pet.); *Baez v. State*, 486 S.W.3d 592, 595 (Tex. App.—San Antonio 2016, pet. ref'd); *see* TEX. PENAL CODE § 21.02(d).

Appellant's brief lists "various evidentiary failings" which, he claims, establish that no reasonable jury could have found him guilty of the charged offense. First, he points to the complainant's "multiple recantations." However, even if a complaining witness recants or denies his or her outcry statements when testifying at trial, the factfinder is entitled to disbelieve the complainant's recantation and credit his or her previous statements. *Chambers v. State*, 805 S.W.2d 459, 461 (Tex. Crim. App. 1991) (factfinder entitled to judge credibility of witness, observe their demeanor, reconcile conflicts in evidence and disbelieve witnesses' recantation); *see also Reyes-Bonilla v. State*, Nos. 05-19-00983-CR, 05-19-01002-CR & 05-19-01003-CR, 2021 WL 4260771, at *4 (Tex. App.—Dallas Sept. 20, 2021, no pet.) (mem. op., not designated for publication); *Spence v. State*, No. 05-19-00452-CR, 2020 WL 5056556, at *4 (Tex. App.—Dallas Aug. 27, 2020, pet. ref'd) (mem. op., not designated for publication); *Davis v. State*, No. 05-19-00625-CR, 2020 WL 5015276, at *11 (Tex. App.—Dallas Aug. 25, 2020, no pet.) (mem. op., not designated for publication). "The fact that a witness makes contradictory or inconsistent statements does not destroy his or her testimony as a matter of law." *Owens v. State*, 381 S.W.3d 696, 709 (Tex. App.—Texarkana 2012, no pet.); *see also Gutierrez v. State*, No. 05-19-00560-CR, 2022 WL 100108, at *3 (Tex. App.—Dallas Jan. 11, 2022, no pet.) (mem. op., not designated for publication).

The State in this case presented testimony that offered reasons and context for the complainant's recantation, in conjunction with testimony that showed the abuse occurred. More specifically, the State presented evidence from which the jury could have concluded that mother either did not believe the abuse happened or did not want to believe it happened because of her feelings for appellant, and that mother's skepticism that the abuse occurred was not based on an objective assessment of the complainant's allegations. The jurors also could have concluded that mother coached or pressured the complainant to recant, and that the complainant recanted to appease mother and because she did not want to anger appellant.

Second, appellant argues that, because of a lack of corroborating evidence, no jury could have believed the essential elements of the offense. He also claims that "[t]here was an obvious lack of investigation in this case." But appellant's focus on the alleged inadequacy of the investigation or the lack of certain types of corroborating evidence is not relevant to our review of the evidence. We review the evidence presented at trial and not the sufficiency of the investigation. *See Murray v. State*, No. 05-19- 01180-CR, 2020 WL 4435304, at *7 (Tex. App.—Dallas Aug. 3, 2020, no pet.) (mem. op., not designated for publication) ("In assessing the sufficiency of the evidence . . . we consider the evidence admitted at trial—what was not in evidence is irrelevant to our determination of the sufficiency of the evidence."); *McLemore v. State*, No. 05-15-00160, 2015 WL 9591398, at *3 (Tex. App.—Dallas Dec. 31, 2015, no pet.) (mem op., not designated for publication)

–40–

("[W]e do not review the sufficiency of the police investigation; rather, we review the evidence presented at trial.). Moreover, outcry testimony alone can be sufficient to sustain a conviction for continuous sexual abuse of a child. *E.g.*, *Killian v. State*, No. 05-19-00227-CR, 2020 WL 2847275, at \*9 (Tex. App.—Dallas June 2, 2020, pet. ref'd) (mem. op., not designated for publication); *see Tear v. State*, 74 S.W.3d 555, 560 (Tex. App.—Dallas 2002, pet. ref'd). "The State has no burden to produce any corroborating or physical evidence." *Martines v. State*, 371 S.W.3d 232, 240 (Tex. App.—Houston [1st Dist.] 2011, no pet.); *see Perez v. State*, No. 05-19-01225-CR, 2021 WL 869636, at \*4 (Tex. App.—Dallas March 9, 2021, no pet.) (mem. op., not designated for publication).

The State presented evidence from which the jury could have reasonably concluded that appellant sexually abused the complainant. That evidence included the complainant's disclosure to Queller and her detailed descriptions of abuse to the forensic examiner. Appellant testified that, when the complainant was five and six, she would get in bed with him when he was naked and snuggle with him. While appellant denied any abuse occurred, the complainant described details of sexual abuse that an average six-year-old should not know. Both mother and father agreed the complainant should not know such things, as did the sexual assault nurse examiner. The jury could have found that the complainant's knowledge of these details tended to corroborate that the abuse occurred. Based on the evidence, the jury could have concluded that the complainant's recantations were not truthful, and

–41–

that the abuse occurred.

Appellant next argues the evidence did not support a finding that two or more specific acts of abuse occurred more than thirty days apart. *See* TEX. PENAL CODE § 21.02(b). There is, however, evidence showing the complainant turned five years old in February 2017 and six in February 2018. In June 2018, the complainant told Queller that appellant "makes me touch his pee-pee." That same month, the complainant told the forensic interviewer that appellant had her put her hand on his genitals when she was five and six years old. She also told Lanier that appellant put his private part on her private part "a few times" when she was five. When Lanier described a "private touch" to the complainant, she said she was snuggling with appellant when she was five and they were still doing it when she was six, and that appellant would grab her hand and make her touch or grab his "private spot." When he testified, appellant confirmed that he was living in the house with the complainant when she was five years old and six years of age. Based on the evidence, a rational juror could have reasonably concluded the abuse was still occurring when the complainant made her disclosures in June 2018.

After reviewing all the evidence in the light most favorable to the jury's verdict and giving due deference to the jury's weight and credibility determinations, we therefore conclude that, based on the evidence presented, a rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt. We overrule appellant's fourth issue.

We affirm the trial court's judgment.


/Lana Myers//

LANA MYERS
JUSTICE


210556f.u05
Do Not Publish
TEX. R. APP. P. 47.2(b)



## Court of Appeals
## Fifth District of Texas at Dallas

### JUDGMENT

ALEJANDRO AMOLES JR.,
Appellant

No. 05-21-00556-CR    V.

THE STATE OF TEXAS, Appellee

On Appeal from the 416th Judicial
District Court, Collin County, Texas
Trial Court Cause No. 416-84008-
2020.
Opinion delivered by Justice Myers.
Justices Carlyle and Goldstein
participating.

Based on the Court's opinion of this date, the judgment of the trial court is

**AFFIRMED**.

Judgment entered this 19th day of August, 2022.